UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

CHRISTAL G. BIBLE )
)
V. ) NO. 2:10-CV-74
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

## REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for Supplemental Security Income and for Disability Insurance Benefits under the Social Security Act were denied by the Commissioner following a hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 17].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The plaintiff has made no argument other than with regard to the ALJ's findings regarding her mental impairment. A summarization of the medical evidence which significantly relates to her mental condition taken from the plaintiff's memorandum in support of her Motion for Summary Judgment is as follows:

> Dr. Anil Tumkur treated Plaintiff from July 22, 2002 through November 11, 2003. Conditions and complaints addressed during this time include Bell's palsy, migraine headaches, neck pain, bronchial asthma, allergic rhinitis, generalized anxiety disorder, depression, panic attacks, crying spells, social phobia, tobacco use disorder, history of cervical cancer status post hysterectomy, nephrolithiasis, dyslipidemia, chest pains related to anxiety, left arm pain and numbness, elevated blood pressure, and weight gain (Tr. 128-154). On July 9, 2003, Dr. Tumkur opined Plaintiff has an underlying mental disorder which significantly interferes with functioning; panic attacks and phobia in social situations impair her ability to work; depression and anxiety prevent her from interacting with people; and she is unable to drive (Tr. 129-130).
>
> On March 25, 2004, Plaintiff underwent consultative exam by Pamela Branton, M.S. Presenting complaints included nervousness, depression, neck aches and headache when stressed, and back pain. Plaintiff's recent and remote memory were fair; her insight and judgment appeared fair; her concentration was fair; and her mood appeared depressed and mildly anxious. Plaintiff reported that her appetite varies; that she has trouble falling asleep and staying asleep at times; that she is tired all the time and takes a nap every day; that she has feelings of worthlessness and hopelessness all the time and some trouble concentrating; that she feels sad most of the time and cries a lot; that she is nervous when she drives or rides in a car; that she worries a lot about everything; that she has panic attacks when she is stressed, during which her fingers go numb, she feels tired, her heart beats rapidly, her throat constricts, and she vomits; that she gets irritable; and that she has trouble handling stress. The diagnoses were depressive disorder, not otherwise specified; mild panic disorder with mild agoraphobia, provisional; nicotine dependence; and personality disorder, not otherwise specified (with dependent features); with a global assessment of functioning [hereinafter "GAF"] of 60. Ms. Branton opined Plaintiff's ability to relate is moderately limited; her ability to understand and remember directions appears somewhat limited; she could probably understand moderately detailed to possibly complex instructions, but might have difficulty remembering more than

moderately detailed instructions; her recent and remote memory appears somewhat limited; her concentration appears mildly to moderately limited; her social interaction appears mildly to moderately limited; and she presents as a somewhat dependent individual (Tr. 155-160).

On April 2, 2004, a reviewing state agency psychologist opined Plaintiff is markedly limited in her ability to interact appropriately with the general public and moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting (Tr. 161-177).

On July 15, 2004, Plaintiff underwent consultative exam by Alice Garland, M.S. Plaintiff reported that she drives short distances, but rarely; that she has at least two panic attacks per day, during which her chest goes tight, her heart races, and her esophagus closes up; that she has been depressed for four to five years because she cannot do what she used to do and is not the person she used to be; that she tends to eat under stress; that she has trouble staying asleep; that she is depressed most of the time, which makes her not want to do anything; and that she tends to cry. Plaintiff's insight and judgment appeared fair; she was mildly anxious; and she was tearful a few times. The diagnoses were depressive disorder, not otherwise specified; panic disorder, with some agoraphobic features; and personality disorder, not otherwise specified, with dependent features. In summary, Ms. Garland opined Plaintiff may be limited in the abilities to do very detailed work; her ability to persist and concentrate is moderately limited; her ability to get along with people appears to be mildly limited; her ability to work with the public appears to be at least moderately limited; her adaptation appears to be at least moderately limited; and these could exacerbate to severely limited when Plaintiff is having a panic attack (Tr. 266-274).

Plaintiff presented to Rural Health Services on August 4, 2004. Presenting problems included chest pain and tightness, shortness of breath, wheezing, chronic cough, anxiety, depression, nervousness, and constant worrying. On exam, Plaintiff was obese; she had moderate wheezing; her left chest wall was tender to palpation; her mood was anxious; and she was crying. The diagnoses were chest pain/costochondritis; depression/anxiety; history of hypercholesterolemia; asthma; tobacco disorder; high risk medications; history of cervical cancer, status post hysterectomy; and history of questionable CVA or Bell's palsy (Tr. 276-280).

Plaintiff continued treatment by Dr. Tumkur and Dr. Anita Alwani from February 10, 2004 through February 10, 2005, during which time she was suffering blood in right external ear canal, depression, increasing anxiety, obesity, allergic rhinitis, asthma, daily crying spells, panic attacks, palpitations, occasional insomnia, nighttime restlessness, right ankle injury, right ear pain, hypertriglyceridemia, morning headaches, excessive daytime sleepiness, and possible obstructive sleep apnea (Tr. 281-287, 344-359). By December 8, 2004, Plaintiff's anxiety had become so bad that she was not able to work or drive her son to school (Tr. 346).

Dr. Shirley Trentham was Plaintiff's treating psychiatrist from May 17, 2005 through August 2, 2005, during which time she carried the diagnoses of panic disorder with agoraphobia, obsessive-compulsive disorder, and rule out posttraumatic stress disorder, with a GAF of 50. During treatment, Plaintiff was suffering depression, anxiety, social isolation, sad mood, hopelessness, feelings of worthlessness, guilt, fearfulness, crying spells, irritability, decreased sleep, fears of being around people, slowed psychomotor behavior, paranoia, inability to complete tasks, agoraphobia, and excessive worry (Tr. 360-370). On August 2, 2005, Dr. Trentham opined Plaintiff has no useful ability (poor/none) to deal with public; use judgment with the public; deal with work stresses; function independently; maintain attention and concentration; understand, remember, and carry out complex job instructions; or relate predictably in social situations. Plaintiff's ability to function was noted to be seriously limited, but not precluded (fair) in the areas of relate to coworkers; interact with supervisors; understand, remember, and carry out simple or detailed job instructions; behave in an emotionally stable manner; and demonstrate reliability (Tr. 369-370).

On July 11, 2007, Plaintiff underwent her second consultative exam by Alice Garland, M.S. Plaintiff reported that her childhood was bad; that her emotional problems worsened after she underwent a hysterectomy and were exacerbated even further when her father died in 2003 and her mother died in 2005. Plaintiff further reported that she lost interest about four years prior and has gained over 100 pounds; that she cannot sleep well because her legs hurt; that she feels worthless and hopeless; that she has had panic attacks for four years, but controls them by staying at home; that she has OCD; and that she does not relate well. Ms. Garland estimated Plaintiff's ability to relate as fair. No diagnosis was offered, as Ms. Garland felt the results were exaggerated. In summary, Ms. Garland noted Plaintiff was sobbing some during the evaluation; she was anxious a lot during the evaluation; she has a history of psychiatric problems which has been documented; it is difficult to best determine limitations caused by her emotional problems; she has been diagnosed with panic disorder with agoraphobia and obsessive compulsive disorder with a rule out of posttraumatic stress disorder; she also has symptoms associated with depression; and there may also be a personality disorder with dependent features (Tr. 371-380).[1]

Plaintiff continued treatment by Dr. Trentham from August 22, 2006 through September 6, 2007. Conditions and complaints addressed during this time include grief issues, anxiety, panic disorder with agoraphobia, severe major depressive disorder, obsessive compulsive disorder, tearfulness, inability to get out and do things, and sleep

---

[1]Ms. Garland also felt that the test results showed malingering and that plaintiff complained of "an unlikely combination of symptoms" (Tr. 376). However, Ms. Garland also completed a mental assessment of the plaintiff's ability to do work related activities. In it, she opined that plaintiff had no impairment of her ability to understand and remember and carry out simple instructions, and of her ability to make judgments on simple work-related decisions. However, her abilities to interact with the public, supervisors, and co-workers and to respond appropriately to usual work situations were opined to be both "moderate" and "marked" with a question mark and the written notation which appears to say "concern of exaggeration." The mental assessment form defines "moderate" as "more than a slight limitation...but the individual is still able to function satisfactorily." It defines "marked" as indicating a "major limitation" with "no useful ability to function in this area." (Tr. 378-79).

4

> disturbance (Tr. 437-440). On September 6, 2007, Dr. Trentham opined Plaintiff has no useful ability (poor/none) to follow work rules; deal with public; use judgment with the public; deal with work stresses; function independently; maintain attention and concentration; understand, remember, and carry out complex job instructions; behave in an emotionally stable manner; or relate predictably in social situations. Plaintiff's ability to function was noted to be seriously limited, but not precluded (fair) in the areas of relate to coworkers; interact with supervisors; understand, remember, and carry out simple or detailed job instructions; and demonstrate reliability (Tr. 399-400).
>
> Plaintiff was seen at Rural Health Services Consortium on August 28, 2007, for treatment of hypertension, depression, bilateral leg pain, hypothyroidism, and dyslipidemia (Tr. 409-413).

[Doc. 11, Pgs. 2-8].

This case was originally remanded by the Appeals Council on its own motion on May 1, 2007. In the prior decision, the ALJ found that the plaintiff had no severe mental impairment. (Tr. 58). The Appeals Council found this to be error, saying that "the Administrative Law Judge rejected the medical opinions from these three sources (Ms. Branton's evaluation (Tr. 155), the state agency psychologist (Tr. 161) and the first evaluation of Ms. Garland (Tr. 266)), substituting his own interpretation of the objective clinical data". The Appeals Council found he concluded that the plaintiff was malingering when the psychologist's reports did not actually say that, although as stated above, Ms. Garland did so opine in her second evaluation of the plaintiff. The ALJ was directed to obtain updated medical records from treating and other sources. If necessary to determine the plaintiff's limitations, the ALJ was directed to obtain a consultative examination and, if necessary, to call a medical expert "to clarify the nature and severity of the claimant's impairment(s)." (Tr. 311-12).

In accordance with the Appeals Council's mandate, the ALJ had the plaintiff examined a second time by Ms. Garland, and utilized the services of Dr. Thomas Schacht,

5

a psychologist, as a medical expert at the administrative hearing. Although relied upon extensively by the Commissioner in his brief, the Court was unable to locate any reference to, or reliance upon, Dr. Schacht in the ALJ's hearing decision.

A vocational expert, Dr. Robert Spangler, was called to testify at the administrative hearing. He was only asked by the ALJ to describe the plaintiff's past relevant work, which he did. Plaintiff's counsel asked the VE whether there were jobs the plaintiff could perform if she had the limitations opined by Dr. Trentham in Exhibit 28F (Tr. 399, 400). He opined that there were none. He was then asked if there were jobs which the plaintiff could perform if she were limited to the extent set forth by Ms. Garland following her 2004 examination of the plaintiff on the "Assessment of Ability to Do Work-Related Activities" (Tr. 272-74) portion of her report, contained on pages 7 and 8 thereof (Exhibit 17F). The VE again said there would be no jobs. Finally, he was asked if there would be jobs if the assessment of State Agency psychologist Pestrak, pages one and two, was correct (Tr. 161-62). On those pages, Dr. Pestrak found several "moderate" limitations in certain areas, but only one "marked" limitation, which was in the area of interacting appropriately with the general public (Tr. 162). Nonetheless, the VE again opined that there would be no jobs which the plaintiff could perform if limited to that extent. (Tr. 551-53).

In his hearing decision, the ALJ found that the plaintiff had a severe impairment of a personality disorder (Tr. 21). After recounting the medical evidence, the ALJ concluded that the plaintiff did not meet the criteria of the mental Listing of Impairments. Specifically, he found she had a mild restriction in the activities of daily living. He found she had "moderate" difficulties in social functioning, but found Dr. Tentham's finding of a "marked"

6

limitation "too restrictive and inconsistent with the remaining documentary evidence." As to concentration, persistence or pace, the ALJ found that she had "mild to moderate difficulties." He found there was "no documentary evidence of episodes of decompensation of extended duration requiring mental health hospitalization." Since he found that her mental impairment did not cause at least two "marked" limitations, or one "marked" limitation and repeated episodes of decompensation, he found she did not meet the "B" criteria required to meet the Listings. (Tr. 25).

Finding that the plaintiff failed to meet a Listing, the ALJ then considered whether her impairment prevented her from engaging in substantial gainful activity. He concluded that she retained the residual functional capacity to perform the full range of work at all extertional levels. As for the effects of her non-exertional mental impairment of a personality disorder, he found that "while the claimant can work with others, the evidence suggests she would work best alone." (Tr. 26). He noted that her condition improved if she was compliant with her medications, and that she was repeatedly noncompliant. He also mentioned the exaggeration of symptoms noted by Ms. Garland. He found that her activities of daily living such as making sandwiches and folding laundry, visiting friends and family, and handling her own funds indicated she was not as limited as she claimed. He found that "there is no objective medical evidence supporting the claimant's complaints that she is unable to perform substantial gainful activity..." He stated that he gave "great weight" to the opinions of Dr. Tamkur and Dr. Alwani, treating medical doctors, Ms. Garland and Ms. Branton. He gave "less weight" to the opinions of Dr. Trentham because the limitations found by her "appear inconsistent with her own narrative reports and are too restrictive and

7

inconsistent with the remaining documentary evidence of record." He concluded that she could perform "her past relevant work with compliance of treatment and medication." (Tr. 27). For these reasons, he found that the plaintiff was "not disabled." (Tr. 28).

Plaintiff asserts that the ALJ's residual functional capacity finding is not supported by substantial evidence. Specifically, she states that the ALJ failed to properly consider the various reports and evidence supporting her allegations, including of course the reports of Dr. Trentham, her treating psychiatrist, and, at least portions of the reports of Ms. Garland and the State Agency psychologist.

As stated above, the Appeals Council reversed the original finding of the ALJ set out in his March 23, 2005, hearing decision and remanded the case for a determination of the limitations caused by her mental impairment on May 1, 2007. The only significant evidence mentioned in the hearing decision, post-remand, were treatment notes and mental assessments by treating psychiatrist Dr. Shirley Trentham, and the second evaluation conducted by the consultative examiner, Ms. Alice Garland.

It goes without saying that Social Security cases involving only mental impairments are the most difficult evaluate. There are few visible indicators like those available with physical impairments, such as impinged nerve roots, atrophied muscles, or documented muscle spasms, to provide objective proof from which to gauge the validity of complaints. While the effects caused by an imprisoning mind are no less disabling than a severed hand, they are, by their nature, far easier to fake. In the case of mental disorders lacking an organic cause, there are precious few tools available to make a meaningful assessment other than the qualifications and experience of the mental health professionals who examine or treat the

8

claimant, and psychological testing.

Dr. Trentham personally saw the plaintiff on May 17, 2005 (Tr. 363), June 28, 2005, (Tr. 361) August 22, 2006 (Tr. 440), and January 4, 2007 (Tr. 439).² Someone in her office either talked to or saw the plaintiff on May 26, 2005 (Tr. 362), and May 23, 2007 (Tr. 437). Her mental assessments (Tr. 369 and 399), generated over two years apart, are quite consistent. The treatment notes on which the assessments are based indicate that Dr. Trentham listened to the plaintiff's subjective complaints, observed her tearful demeanor and signs of anxiety, deemed her credible, and diagnosed her accordingly.

Ms. Garland examined the plaintiff and conducted psychological testing on July 15, 2004 (Tr. 266) and July 11, 2007 (Tr. 371). Her observations and the result of the plaintiff's tests indicated to her that the plaintiff was "exaggerating her symptoms," "taking on the sick role" for possible secondary gain, and "malingering symptoms of emotional problems."

While treating physicians, such as Dr. Trentham, are entitled to deference, the "ALJ may properly discount a treating physician's opinion of disability" and follow the opinion of a consulting examiner if the consult's opinion is supported by the medical record. *Combs v. Commissioner of Social Security*, 459 F.3d 640, 652 (6th Cir. 2006). In the opinion of the Court, the opinions of Ms. Garland contained in her two reports (as opposed to those on the mental assessment forms discussed *infra*), based as they are upon both her knowledge and experience and the test scores, would constitute substantial evidence to support a finding that the plaintiff was exaggerating the effects of her condition. *How much she was exaggerating*

---

²All of Dr. Trentham's treatment notes may not be in the file, as the one from August 22, 2006 indicates "Chrystal [*sic*] returns for followup with me after a period of six weeks."

*them* is another question.

To determine the *extent* of limitation, ALJ's and reviewing courts look to the assessments completed by treating and consultative sources. Ms. Garland, unfortunately for the Commissioner, completed assessment forms which do not reflect the conviction of her written report. The original mental assessment by Ms. Garland opines that plaintiff has a "poor" ability[3] to deal with the public, deal with work stresses, function independently, maintain attention/concentration, to behave in an emotionally stable manner and to demonstrate reliability (Tr. 272-73). Her second mental assessment opined that plaintiff had moderate to marked abilities to interact appropriately with the public, supervisors and co-workers, and to respond appropriately to usual work situations and changes in work settings. Ms. Garland put a question mark on the form and indicated "concern of exaggeration." (Tr. 378-79).

Ms. Garland's assessment leaves the Court bewildered. If plaintiff is malingering and exaggerating her symptoms for secondary gain, then why did Ms. Garland not have the "courage of her convictions" and indicate a perceived level of function at a higher level? At best, the combination of Ms. Garland's written reports and the mental assessment forms which accompany them can be read together to say "*if* the plaintiff is *not* lying or malingering, she is quite severely impaired in her level of functioning." Had the reports and the mental assessments, or even just the last one submitted, jived with one another, then this Court would very likely have found that substantial evidence existed to support the ALJ's finding of residual functional capacity.

---

[3] "Ability to function in this area is seriously limited but not precluded."

There is yet another serious problem regarding the opinions of the VE. When shown Ms. Garland's 2004 mental assessment, he opined that she could perform no jobs. The Commissioner argues that plaintiff's counsel did not show him the written report. If he had been shown both, what was he to do, believe the one and disregard the other, or divine from the report that the limitations in the assessment were actually less serious? If the report "cancels out" the assessment, why did she bother to complete the assessment which appears to contradict everything she just said in the report?

Although he was not shown Ms. Garland's 2007 report and assessment, logically the same concerns remain. The ALJ lacked substantial evidence to find that the plaintiff could return to all of her past relevant work. The Court is also of the opinion that the Commissioner's position was not substantially justified.

This does not mean that the plaintiff is entitled to benefits. The written reports of Ms. Garland at least have the effect of showing that there is substantial reason for concern regarding the validity of Dr. Trentham's assessments. A remand is recommended for further evaluation of the degree of functional limitation wrought by plaintiff's mental impairment.

Aside from the main issue, the Court must reluctantly address an argument casually inserted into the Commissioner's brief which borders on the spurious, and to be blunt, was a disappointing surprise for the Court. On Page 7 of the defendant's brief, he states "Dr. Trentham filled out a form *created by Plaintiff's attorney.*" (emphasis added). Further on in that paragraph, he says "Dr. Trentham opined that Plaintiff had either a 'fair' or 'poor/none' ability to perform thirteen out of the fifteen activities *selected by Plaintiff's attorney.*"

The forms filled out by Dr. Trentham were, in fact, "Form SSA-1152" which went into use in April of 1985. Thus, they were not "created by Plaintiff's attorney," but by the Social Security Administration itself. Also, the "activities" outlined therein were not "selected by plaintiff's attorney." The source of the forms is printed clearly on the face of both assessments (Tr. 369, 399). To be sure, Form SSA-1152 has been replaced by Form HA-1152-U3, and has not been an "official form" since before plaintiff filed her applications. However, the fact that the form was replaced by a later version which has more categories and degrees of restriction does not mean that it could not still be used as physician's opinion of the extent of plaintiff's limitations. There is no other discernable purpose for this argument than to give the Court the false impression that the plaintiff's counsel was "gimmicking" up evidence by creating his own "slanted" forms. That is not what happened here. It is difficult to see how the inclusion of this language could have been an accidental oversight, but the Court hopes that it was, and trusts that the veracity of such assertions will be better vetted in the future.

There is not substantial evidence to support the ALJ's finding regarding the plaintiff's residual functional capacity. Accordingly it is respectfully recommended that the case be remanded to the defendant Commissioner for further evaluation of the degree of limitation imposed by the defendant's mental impairment. It is therefore recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be GRANTED insofar as it requests a remand, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 17]

be DENIED.[4]

                              Respectfully submitted:

                                     s/ Dennis H. Inman
                                  United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).